**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

**No. 5:10-CR-00103-H**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| DANNY ALLISON BATTLE, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the motion of Defendant, Danny Allison Battle ("Battle" or "Defendant"), to suppress evidence seized and statements made as a result of Battle's arrest and the search of his residence [DE-29]. The Government has responded [DE-30]. To further develop the record, the Court conducted an evidentiary hearing on October 4, 2010, at which the Government and Battle with his counsel appeared. This matter is now ripe for decision.

## I. STATEMENT OF THE CASE

On April 7, 2010, the Grand Jury issued a one count indictment charging that: "On or about March 5, 2010, in the Eastern District of North Carolina, the defendant, DANNY ALLISON BATTLE, having been convicted of a crime punishable by a term of imprisonment exceeding one (1) year, did knowingly possess in and affecting commerce, a firearm, that being, a Smith and Wesson, Model 638, .38 caliber revolver, in violation of Title 18, United States Code, Sections 922(g)(1) and 924."

At the time of the alleged violation, Defendant was serving a three year term of supervised release subsequent to serving a 96 month term of imprisonment for a violation of 18 U.S.C. § 922(g)(1), felon in possession of a firearm. Defendant's United States Probation Officer, while on

supervised release, Tuell Waters ("USPO Waters"), filed a petition with the Court for Defendant's arrest after USPO Waters learned of allegations by the Raleigh Police Department that Defendant was involved in criminal conduct and was charged with drug offenses. On March 2, 2010, the Court issued an arrest warrant, and on March 5, 2010, the United States Marshal's Service executed the warrant and arrested Defendant. During the execution of the arrest warrant, officers searched Defendant's bedroom and seized a Smith & Wesson .38 caliber revolver. Defendant filed the instant motion to suppress evidence seized and statements made in connection with the arrest.

## II. STATEMENT OF THE FACTS

Deputy United States Marshal John Hardy ("Marshal Hardy") and Defendant were the sole witnesses at the October 4, 2010 evidentiary hearing and testified as follows:

### A. Testimony of Deputy United States Marshal John Hardy

Marshal Hardy has been employed as a Deputy United States Marshal for 16 years. His primary duties are to enforce the orders of the United States District Court, transport prisoners, and arrest fugitives.

On March 5, 2010, Marshal Hardy participated in the arrest of Defendant. USPO Waters had previously informed the Marshal's Service that an arrest warrant had been issued for Defendant for violation of supervised release and that Defendant had failed to turn himself in as previously arranged. Marshal Hardy subsequently received a copy of the arrest warrant[1] and prepared to execute the warrant. At approximately 6:30a.m. or 6:45a.m., Marshal Hardy, USPO Waters, four officers

---

[1] Government Exhibit 1, admitted into evidence at the hearing, was a copy of the arrest warrant.

from the Fugitive Task Force, and a student intern met at the Raleigh Federal Building to develop an operational plan for Defendant's arrest. USPO Waters advised the group where Defendant lived, that Defendant had been charged by the Raleigh Police Department with maintaining a dwelling for narcotics trafficking, and that he believed Defendant carried a weapon based on information from the Raleigh Police Department. Marshal Hardy knew from his review of Defendant's record that he had a previous conviction for being a felon in possession of a firearm. USPO Waters also showed the group Defendant's picture.

After completing the operational planning, Marshal Hardy and his team proceeded to Defendant's residence in a three vehicle motorcade. They were dressed in police attire, which included body armor and tactical gear, and their weapons were visible. USPO Waters had previously visited Defendant at his residence and informed Marshal Hardy that Defendant's bedroom was in the front right corner of the house.[2] Defendant's house was at the corner of two cross streets, and Marshal Hardy stopped his vehicle directly in front of Defendant's house while the other two vehicles proceeded around the corner to cover the side and back of the house. One officer was positioned to watch the right of the house, and Marshal Hardy, USPO Waters and a third officer entered onto the front porch to "knock and announce" their presence. The officers stationed outside the house carried long guns and the officers entering the house carries hand guns.

Marshal Hardy knocked on the door and announced "police" for several minutes with no response until he saw movement at the front window of the bedroom that had been identified by

---

[2] Government Exhibits 2 & 3, admitted into evidence at the hearing, pictured the exterior front and side of Defendant's residence.

USPO Waters as Defendant's bedroom.[3] After seeing movement, Marshal Hardy continued to knock and announce for two more cycles with no answer at the door. Marshall Hardy knew that multiple people, including Defendant's wife, lived in the house, but did not know how many people were in the house at that time. He was concerned that Defendant might move to another part of the house or come out firing through the door. Marshal Hardy touched the front door, and it swung open easily, as if it were weighted, into an open living room area that was sparsely decorated and contained two couches. Marshal Hardy continued to announce "police" as he entered the residence through the front door. The officers' guns were drawn and keyed on the Defendant's bedroom door, which was located along the wall immediately to the right of the front door.[4] Marshal Hardy continued to announce "police" and "come to the door" as the officers performed a protective sweep of the living room area while moving toward the bedroom door.

After approximately a minute, an unclothed female, later identified as Defendant's wife Rosalind Battle, cracked open the bedroom door. The officers could not see into the room. Marshal Hardy told her that they were there for "Danny," that he needed to come out, and that she should get dressed. The door closed and Marshal Hardy heard movement in the room. After another minute passed, Marshal Hardy called her to come back to the door and asked her, "Where is Danny?". She responded that Danny was her husband and that he was in bed. Marshal Hardy could see movement in the bedroom and ordered Rosalind Battle out of the bedroom and to the corner of the living room

---

[3] Government Exhibit 4, admitted into evidence at the hearing, pictured the front of the house showing the window of the bedroom identified by Marshal Hardy as Defendant's bedroom.

[4] Government Exhibit 5, admitted into evidence at the hearing, was a diagram drawn by Marshal Hardy of the front area of Defendant's house.

where she was monitored by USPO Waters. Marshal Hardy then ordered Defendant to back out of the bedroom and handcuffed him while the third officer kept his gun trained on Defendant. Defendant was wearing shorts with pockets and no shirt, and Marshal Hardy performed a quick pat down, which revealed a large quantity of cash that was later returned to Rosalind Battle after she produced evidence that the money was the proceeds of a tax refund. Marshal Hardy seated Defendant against the wall by the bedroom door. The officers then secured their weapons. Marshal Hardy told Defendant that they were there because of his supervised release violation, and USPO Waters explained why Defendant was being arrested. Marshal Hardy described Defendant as calm and compliant after Defendant came to the bedroom door. Rosalind Battle was by contrast described as erratic and upset and questioning why the officers were present.

At this point, the officers had not performed a protective sweep of any portion of the house beyond the front living room area, although it was a large house with multiple rooms in the back. No one, at this time, advised Defendant of his *Miranda*[5] rights, although Marshal Hardy did possess an advice of rights card during the arrest. The officers did not have a search warrant. Marshal Hardy told Defendant that he was going to search Defendant's bedroom and asked Defendant if there was anything in the room that "he needed to worry about," such as contraband or firearms that could cause injury. After a brief pause, Defendant responded that there was a gun in the bedroom. Marshal Hardy asked where the gun was located, and Defendant responded that it was on the floor on the right side of the bed. Marshal Hardy then went into the bedroom to search for the gun.

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Marshal Hardy explained that, based on the information from the Raleigh Police Department and USPO Waters, he was concerned the Defendant had a weapon or narcotics in the bedroom. He further explained that while his primary mission was to execute the arrest warrant, his secondary mission, routine with any arrest, was to secure the safety of the public when there is a suspicion that contraband or firearms are present.

Marshal Hardy described the bedroom as unkempt with trash, bottles, and clothes covering the floor. He could not find the gun in the area that had been indicated by Defendant. Marshal Hardy again asked Defendant where the gun was located, and Defendant responded as before, that it was on the floor beside the bed. Marshal Hardy asked Defendant what the gun looked like, and Defendant responded that it was black and silver. Marshal Hardy continued his search, but did not locate the gun. Defendant was then brought into the room to show the officers where the gun was located and pointed with his foot to an area on the floor. The officers still could not locate the gun. Defendant was returned to the living area and the officers then moved the mattress and box springs to search for the gun under the bed. After searching through a significant amount of debris for approximately one minute, Marshal Hardy found the gun[6] approximately a foot from where Defendant had indicated. Marshal Hardy removed four live rounds and one spent round of .38 hollow point ammunition[7] from the cylinder and secured the gun in his vehicle. During the search

---

[6] Government Exhibit 6, admitted into evidence at the hearing, pictured the gun found in Defendant's bedroom.

[7] Government Exhibit 7, admitted into evidence at the hearing, pictured the ammunition removed from the gun.

of the bedroom, the officers also located and seized two baggies containing a substance that appeared to be marijuana,[8] which were in plain view on the dresser.

During the exchange with Defendant regarding the location of the gun, Marshal Hardy made no threats or promises to Defendant and described Defendant's demeanor as calm, clear headed, and focused. Marshal Hardy did not find anyone besides Defendant and Rosalind Battle in the bedroom, but USPO Waters encountered another person coming from the back of the house into the living room. The officers did not search any area of the house beyond the bedroom, and none of the officers stationed outside the house came inside.

Defendant was taken to the Office of the United States Marshal for processing. Once Defendant was placed in the cell block, Marshal Hardy, accompanied by USPO Waters, read Defendant his *Miranda* rights from an advice of rights card.[9] Marshal Hardy asked Defendant if he understood his rights, and Defendant responded affirmatively. Marshal Hardy then asked Defendant if he was willing to waive his rights and talk. Defendant responded affirmatively and agreed to make a statement regarding the weapon found at his residence. Marshal Hardy stated that Defendant's demeanor remained quiet and calm and that Defendant was cooperative at all times.

**B. Testimony of Defendant**

Defendant testified that he lived at the address where he was arrested with Rosalind Battle and four children ranging from age 10 to 15. Defendant denied having heard the officers knocking

---

[8] Government Exhibit 8, admitted into evidence at the hearing, pictured the two baggies seized.

[9] Government Exhibit 9, admitted into evidence at the hearing, pictured the advice of rights card used by Marshal Hardy.

on the front door because he was asleep and stated that by the time he heard the officers they were already in the house. Defendant did remember the officers knocking at the bedroom door, but could not remember what the officers said or if they announced "police." Defendant was not dressed and was putting on his clothes when Rosalind Battle went to the door.

Defendant testified that at the time of his arrest he observed three heavily armed officers with guns drawn. Defendant recognized USPO Waters, who Defendant acknowledged had been to the house several times. Defendant stated that after he came out of the bedroom, but before Marshal Hardy entered the bedroom, Marshal Hardy patted him down and then started questioning him about a gun. Defendant stated that he answered Marshal Hardy's question as to whether there was contraband or firearms in the bedroom because he felt pressure to respond, but admitted that the officers did not threaten him, use physical force, or make any promises to induce him to answer questions. Defendant stated that he felt pressure during the entire encounter and that he showed Marshal Hardy where the gun was located because he felt pressure and felt he had no choice. Defendant did not recall whether he had seen the gun at issue on the day he was arrested.

Defendant did not recall being advised of his *Miranda* rights while in the holding cell and described being scared, nervous and feeling pressure, although Defendant admitted he had been advised of his rights on many other occasions. He stated that he talked to Marshal Hardy and USPO Waters because he felt pressure and felt that he had no choice but to answer the questions asked by the officers. Defendant admitted having been through the arrest procedure often and admitted that he knew what was happening and that he was not impaired by drugs when the officers arrested him on the pending charges. He could not recall the exact number of times he had been arrested, but

admitted to being arrested "a few times," including three arrests in 1993 for larceny, assault with a deadly weapon, carrying a concealed weapon, possession with the intent to sell and deliver cocaine, and maintaining a place for controlled substances, one arrest in 1995 for injury to personal property, one arrest in 1997 for possession with the intent to sell and deliver cocaine, and one arrest for a federal violation in 1999 for possession of a firearm by a convicted felon.

## III. DISCUSSION

Defendant contends that all evidence seized and statements made in connection with his arrest should be suppressed because (1) Defendant's bedroom was searched without a warrant, (2) Defendant's statement regarding the gun was made before he was advised of his *Miranda* rights and was involuntary, and (3) Defendant's post-arrest statement was tainted by the earlier violation of his rights.

### A. Warrantless Search

Defendant first contends that the officers did not have a warrant to search his bedroom and that the search was based on Defendant's involuntary statement, which was elicited while he was in custody but before he was advised of his *Miranda* rights. The government counters that the questioning and search were justified under exigent circumstances and the public safety exception to *Miranda*.

The Fourth Amendment to the United States Constitution provides people the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "Under the Fourth Amendment, 'even when officers have probable cause to believe that contraband is present in a home, a warrantless search of the home is unlawful unless

exigent circumstances exist at the time of entry.'" *United States v. Handberry*, 372 Fed. App'x 383, 387, 2010 WL 1006715, at **3 (4th Cir. Mar. 19, 2010) (quoting *United States v. Mowatt*, 513 F.3d 395, 399 (4th Cir. 2008)). "Examples of exigent circumstances include a 'risk of danger to the police or to other persons inside or outside the dwelling,'[.]" *United States v. Moses*, 540 F.3d 263, 270 (4th Cir. 2008) (quoting *Minnesota v. Olson*, 495 U.S. 91 (1990)).

It is undisputed that the officers did not have a search warrant for Defendant's residence. However, it is also undisputed that the officers lawfully entered Defendant's home to execute the arrest warrant. *See Payton v. New York,* 112 U.S. 573, 603 (1980) ("[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.") Therefore, the question presented is whether exigent circumstances existed so as to justify the officers' search of Defendant's bedroom without a warrant.

The law is clear that officer or public safety is an exigent circumstance sufficient to overcome the search warrant requirement. *See Moses*, 540 F.3d at 270. In this case, the officers had reason to believe that Defendant possessed a gun that was a potential threat to the officers and other occupants of the home. Marshal Hardy testified that he believed Defendant carried a weapon based on information provided by the Raleigh Police Department and that he knew from his review of Defendant's record that he had a previous conviction for being a felon in possession of a firearm. Marshal Hardy also testified that he was concerned that Defendant might come out firing through the door after the officers saw movement in the window of Defendant's bedroom and no one

responded to the officers' knock and announce. Based on these facts, the Court finds that exigent circumstances existed to justify the warrantless search.

The fact that Defendant was secured before the search does not change the result. *See United States v. Young*, 58 Fed. App'x 980, 2003 WL 283189 (4th Cir. Feb. 11, 2003) (denying motion to suppress gun seized from home where the search was conducted after defendant was handcuffed). Marshal Hardy testified that his secondary mission, routine with any arrest, was to secure the safety of the public when there is a suspicion that contraband or firearms are present. Defendant testified that four children reside in the house. Additionally, the officers had not performed a sweep of the house and did not know who else might be present. Therefore, the fact that Defendant was secured did not eliminate the threat posed by the gun.

**B. Defendant's Statement Made During Arrest**

Defendant next contends that his statement made during his arrest regarding the presence and location of the gun is inadmissible because he was not advised of his *Miranda* rights and the statement was involuntary. The officers' reasonable belief that Defendant possessed a weapon also justified Marshal Hardy's questioning of Defendant regarding the presence of weapons prior to advising him of his *Miranda* rights. The Fourth Circuit has applied the public safety exception to the *Miranda* requirement in similar circumstances. For example, in the case of *United States v. Thomas*, the officers were executing an arrest warrant and a search warrant for documentary evidence of drug trafficking at the defendant's apartment. 77 Fed. App'x 673, 675, 2003 WL 22332270, at **1 (4th Cir. Oct. 14, 2003). Prior to advising defendant of his *Miranda* rights, the officers questioned him regarding whether he had any drugs or weapons. *Id.* The defendant directed the

officers to, among other things, a gun in a jacket pocket. *Id.* The court concluded, citing *New York v. Quarles*, 467 U.S. 649, 659 n.8 (1984), that the gun found in the jacket "was admissible under the public safety exception." *Thomas*, 77 Fed. App'x at 675, 2003 WL 22332270 at **1; *see also Young*, 58 Fed. App'x 980, 2003 WL 283189 (affirming denial of suppression motion based on *Quarles* public safety exception where defendant was questioned about weapons in his home before he was advised of his *Miranda* rights).

Finally, the Court finds that Defendant's responses to Marshal Hardy's questions regarding the presence of a gun in the bedroom were voluntary. Due Process requires that statements made to the police be given voluntarily. *Schneckloth v. Bustamonte*, 412 U.S. 218, 255 (1973). In determining voluntariness, courts must evaluate the totality of the circumstances, taking into account both the characteristics of the accused and the details of the interrogation. *United States v. Davis*, 233 Fed. App'x 292, 294, 2007 WL 1544792, at **1 (4th Cir. May 29, 2007) (citing *Schneckloth*, 412 U.S. at 226).

Marshal Hardy testified that he made no threats or promises to Defendant and described Defendant's demeanor as calm, clear headed, and focused during the entire encounter. With respect to the characteristics of the accused, there was no evidence that Defendant's physical or mental capacity was diminished in any way at the time he told the officers that there was a gun in his bedroom. As to the questioning itself, although Defendant testified that he felt "pressure" to answer Marshal Hardy's questions, he also testified that the officers did not threaten him, use physical force, or make any promises to induce him to answer questions. The law is clear that a defendant's subjective mental state alone is insufficient to establish that a statement was involuntary. *Colorado*

*v. Connelly*, 479 U.S. 157, 167 (1986) (holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."). Lastly the fact that the officers were armed and Defendant was handcuffed when questioned does not make the statement involuntary. *See United States v. Ramirez-Martinez*, 112 F.3d 511, 1997 WL 205777, at *2 (4th Cir. Apr. 25, 1997) (finding statement made in response to questioning fifteen minutes after forcible entry into defendant's home was voluntary despite the late hour of the entry, the police being armed, the defendant being handcuffed, and the police using force against a third party during the execution of the warrant). Therefore, the Court concludes that Defendant's statements regarding the location of the gun were voluntary.

**C. Defendant's Post-Arrest Statement**

Defendant contends that his post-arrest statements should be suppressed because they were tainted by the previous constitutional violations. The Court rejects this contention, having concluded that no violation occurred during the search of Defendant's bedroom or the questioning of Defendant regarding the presence of a weapon in his bedroom.

Alternatively, the Court finds credible Marshal Hardy's testimony that he advised Defendant of his *Miranda* rights prior to questioning him in the holding cell and that Defendant waived those rights. Defendant's testimony that he felt he had no choice but to answer Marshal Hardy's questions, even if true, is not alone sufficient to make his waiver involuntary, and Defendant admitted that the officers did not threaten him, use physical force, or make any promises to induce him to answer questions. "The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion." *Connelly*, 479 U.S. at 170. "The voluntariness of a waiver of this privilege

has always depended on the absence of police overreaching, not on "free choice" in any broader sense of the word." *Id.* "Miranda protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that." *Id.* Additionally, Defendant has admitted to multiple prior arrests and that he was familiar with the arrest procedure. *See United States v. Arthur*, 907 F.2d 1140, 1990 WL 86247, at *2 (4th Cir. June 4, 1990) (affirming lower court's finding that waiver of *Miranda* rights was voluntary where defendant admitted he was familiar with his rights from several previous arrests and there was no evidence of coercion or undue influence by investigating agent.).

Finally, Defendant has presented no evidence that would lead the Court to find that the officers intentionally elicited an unwarned statement from Defendant with the intent to later obtain a *Miranda* waiver and a valid statement. The Fourth Circuit requires such a deliberate strategy before excluding postwarning statements based on taint from a prewarned statement. *See United States v. Mashburn*, 406 F.3d 303, 308-10 (4th Cir. 2005) (interpreting *Missouri v. Seibert*, 542 U.S. 600 (2004)).

## IV. CONCLUSION

The Court **RECOMMENDS** that the motion to suppress [DE-29] be **DENIED**.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain

error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This the 27th day of October, 2010.

DAVID W. DANIEL
United States Magistrate Judge